[Cite as *Alcoa Materials Mgt., Inc. v. Niagara Worldwide, L.L.C.*, 2016-Ohio-8158.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| ALCOA MATERIALS MANAGEMENT, INC., | ) | CASE NO. 16 MO 0001 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| NIAGARA WORLDWIDE LLC AND, HANNIBAL DEVELOPMENT LLC, | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS:          Civil Appeal from the Court of Common Pleas of Monroe County, Ohio Case No. 2014-368

JUDGMENT:                                         Affirmed.

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: December 15, 2016

[Cite as *Alcoa Materials Mgt., Inc. v. Niagara Worldwide, L.L.C.*, 2016-Ohio-8158.]
APPEARANCES:

For Plaintiff-Appellee:                    Atty. John Triplett, Jr.
                                           THEISENBROCK
                                           424 Second Street
                                           Marietta, Ohio 45750

                                           Atty. Melissa Tea
                                           K&L Gates LLP
                                           K&L Gates Center
                                           210 Sixth Avenue
                                           Pittsburgh, Pennsylvania 15222

For Defendants-Appellants:                 Atty. Jeffrey Schultz
                                           Armstrong Teasdale LLP
                                           7700 Forsyth Blvd., Suite 1800
                                           St. Louis, Missouri 63105

                                           Atty. Jason Yoss
                                           Atty. Richard Yoss
                                           Yoss Law Office
                                           122 North Main Street
                                           Woodsfield, Ohio  43793

ROBB, J.

**{¶1}** Defendants-Appellants Niagara Worldwide LLC and Hannibal Development LLC appeal the decision of the Monroe County Common Pleas Court granting judgment in favor of Plaintiff-Appellee Alcoa Materials Management, Inc. Alcoa entered an agreement to purchase a bankruptcy debtor's carbon anodes and removed less than half of the anodes from the debtor's property. Thereafter, Niagara was the successful bidder at an auction to purchase the realty and remaining assets of the debtor. Niagara then assigned its rights in the purchase to Hannibal, who refused to permit Alcoa to enter and to complete removal of the anodes. Appellants contend the trial court erred in concluding Alcoa had the right to the remaining anodes. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

**{¶2}** In February 2013, Ormet Corporation and its affiliates filed for Chapter 11 bankruptcy protection in Delaware. One of these companies, Ormet Primary Aluminum Corporation, operated an aluminum smelter plant in Hannibal, Ohio. The facility ceased production in October 2013 in order to liquidate its assets. Ormet used carbon anodes in the production of aluminum. The anodes were blocks the size of a washing machine, which were stacked and de-banded with no pallets. They had to be stored inside and kept dry.

**{¶3}** Ormet entered a contract to sell its estimated 17,086 metric tons[1] of carbon anodes located at the Hannibal plant to Alcoa for $252 per metric ton for a total contract price of $4,305,672.00. On January 2 and 3, 2014, Alcoa and Ormet executed the "Hannibal Anode Purchase and Sale Agreement," which was to be construed under Delaware law. The bankruptcy court approved the sale on January 6, 2014.[2] The agreement established the "Effective Date" as the date the agreement

---

[1] A metric ton is approximately 2,204.62 pounds.

[2] At the same time, Alcoa purchased from Ormet 34,755 metric tons of anodes located at a third-party warehouse in Baltimore, Ohio. The same bankruptcy court order approved this sale as well.

was executed; likewise, under the heading for "Term and Validity," the "Sale Date" was also determined by the execution date.

{¶4} The "Delivery & Freight Terms" provided: "Buyer shall arrange pick-up from Seller's facility, with delivery deemed complete upon loading of the Products onto Buyer's trucks by Seller's personnel." Under the next heading, "Title; Risk of Loss," the agreement read: "Title to and risk of loss or damage to the Product shall pass to Buyer when the Product is delivered to Buyer as per the applicable delivery term above." The Anode Purchase and Sale Agreement also stated: "Buyer shall use reasonable best efforts to remove the Product within 60 days from the date of this Agreement, but shall have 120 days to remove the Product from the later of the date of this Agreement and the securing of all necessary permits." Ormet agreed to provide personnel and equipment to "timely load" Alcoa's trucks and to grant Alcoa and its trucking contractors necessary access to the facility.

{¶5} Alcoa began removing the anodes from the facility in February 2014, after making the first payment of 75%. Ormet used an overhead crane to load the anodes onto trucks supplied by Alcoa. Alcoa paid Ormet the remaining 25% of the purchase price on April 2, 2014.[3] Alcoa experienced difficulties with trucking contractors and warehousing. In June 2014, which was after the contractual 120-day delivery period, a new trucking contractor transported a load of anodes for Alcoa as a stress test. As before, Ormet loaded the anodes onto the truck. By that time, Alcoa had removed 7,316 metric tons of anodes so that 9,770 metric tons remained at the plant.

{¶6} On June 26, 2014, an auction was conducted for Ormet's realty and other remaining assets at the Hannibal plant. Niagara was the successful bidder at $25,250,000.00. An Asset Purchase Agreement was executed after the auction. The bankruptcy court approved the Asset Purchase Agreement on July 17, 2014.

---

[3] The "Payment Terms" provided: "75% payable five (5) days from the later to occur of (i) Buyer's confirmation of the Quantity for the estimated total weight of the anodes by piece count and (ii) the entry of an order by the Bankruptcy Court approving the purchase and sale of the anodes in accordance with this agreement. Remaining 25% payable five (5) days after all anodes have been weighed on a certified scale or no later than 60 days by piece count. A final 'true-up' will be made once all anodes have been weighed and loaded."

**{¶7}** This agreement defined the assets being sold as "all right, title, and interest of Sellers as of the Closing Date in and to all of Sellers' properties and assets * * * but excluding the Excluded Assets * * *." Art. I, 1.01(c). It was elsewhere reiterated: "the Assets shall not include the Excluded Assets." Art. II, 2.01(b). Excluded Assets were defined as including the assets set forth on Schedule 1.01(r). Art. I, 1.01(q).

**{¶8}** Pursuant to this Schedule, Excluded Assets included: "All inventory, whether or not such inventory remains on the Property[,] that has been sold pursuant to an order of the Bankruptcy Court prior to the date of this Agreement." Schedule 1.01(r)(6). The "Inventory Maintenance" section of the Asset Purchase Agreement said Appellants would store and hold at the facility Excluded Assets on behalf of the seller for six months after the closing date and afford to the seller and any purchasers of the Excluded Assets reasonable access to inspect and to remove such assets. Art. V, 5.04.

**{¶9}** On July 29, 2014, Niagara assigned its rights under the agreement to Hannibal Development, who tendered the balance of the purchase price necessary to close the sale of Ormet's remaining assets on July 31, 2014. When Alcoa tried to resume transportation of anodes (using a new trucking contractor) in August 2014, Hannibal Development denied access to Alcoa.

**{¶10}** In September 2014, Alcoa filed a complaint in the Monroe County Common Pleas Court, setting forth four counts: replevin, conversion, tortious interference with contract, and declaratory judgment. Niagara and Hannibal filed a joint answer, and Hannibal filed a counterclaim setting forth four counts against Alcoa: declaratory judgment, intentional interference with business expectancies, trespass, and nuisance.

**{¶11}** A bench trial was set for the replevin and declaratory judgment actions in order to resolve the issue of ownership rights in the anodes. The parties filed a joint stipulation of facts. At trial, Alcoa's material buyer testified about issues with warehousing and transportation, including logistical issues involved in shipping de-banded anodes with no pallets. He testified Ormet said it could load more trucks

than were showing up, but the trucking contractor advised the trucks were not loaded by Ormet on time. (Tr. 86).

**{¶12}** The president of both Niagara and Hannibal Development, who is an industrial plant redeveloper, testified he knew of the Alcoa agreement when he contemplated the purchase of Ormet's assets in May 2014. (Tr. 115). He also said he included the remaining anodes in his broad $25.25 million estimate of the value of Ormet's assets, although he did not itemize the anodes' value. (Tr. 113, 116, 126-127, 131).

**{¶13}** On June 4, 2015, the trial court ruled in favor of Alcoa, concluding "title to the disputed anodes passed to Alcoa and Alcoa is the lawful owner of the disputed anodes herein." The court found the anodes were sold to Alcoa on the "sale date" of January 3, 2014, when the parties executed the Anode Purchase and Sale Agreement. Since this was prior to the Asset Purchase Agreement entered between Ormet and Niagara, the court said the anodes were Excluded Assets under the latter agreement.

**{¶14}** The court disagreed with the claim of Niagara and Hannibal that title to the anodes transferred only if Alcoa took delivery. The court said this would require the court to find Alcoa forfeited its right to millions of dollars' worth of anodes it paid for in full. The court found there was no evidence Alcoa intended to abandon the anodes, noting Alcoa worked with Ormet to solve the logistics problems.

**{¶15}** The court also found Ormet knowingly waived any "condition precedent" involving the 120-day delivery term, citing Delaware law permitting the waiver of contractual requirements or conditions. Lastly, the court referred to itself as a "Court of equity" and observed: Alcoa paid for the anodes in full and used reasonable and diligent efforts with the cooperation of Ormet to remove the anodes.

**{¶16}** The trial court was asked to certify its judgment as a final appealable order under Civ.R. 54(B). On December 16, 2015, the trial court reissued the judgment entry, adding "no just reason for delay" language, citing to Civ.R. 54, and labeling the entry a final appealable order. Niagara and Hannibal (hereinafter Appellants) filed the within appeal.

ASSIGNMENT OF ERROR

{¶17} Appellants' sole assignment of error provides:

"THE TRIAL COURT ERRED IN CONCLUDING THAT TITLE TO THE DISPUTED ANODES PASSED TO ALCOA AND THAT ALCOA IS THE LAWFUL OWNER OF THE DISPUTED ANODES."

{¶18} The parties ask for application of the plain language of two contracts. Legal questions involving the construction of a written contract are reviewed de novo. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995). Where the contract is clear and unambiguous due to plain language, its interpretation is a matter of law and there is no issue of fact to be determined. *Nationwide Mut. Fire Ins. Co.*, 73 Ohio St.3d at 108 (plain language is applied, not interpreted).

{¶19} Appellants contend the trial court legally erred in interpreting the contract and applying Delaware law on the sale of goods. Appellants argue the "Sale Date," defined in the Anode Purchase and Sale Agreement as the date of execution, has no bearing on when there has been a legal sale of goods under Delaware law. Appellants rely on the following language of two statutes, which are part of Delaware's codification of the Uniform Commercial Code ("U.C.C."). First, a "sale" is defined as "the passing of title from the seller to the buyer for a price." 6 Del.C. 2-106(1), citing 6 Del.C. 2-401(1). Second, where matters concerning title become material, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." 6 Del.C. 2-401(1).

{¶20} Pursuant to the Anode Purchase and Sale Agreement, title was to pass when the anodes were delivered "as per the applicable delivery term above;" this delivery term provided: "Buyer shall arrange pick-up from Seller's facility, with delivery deemed complete upon loading of the Products onto Buyer's trucks by Seller's personnel." From this, Appellants conclude the remaining anodes were not sold to Alcoa on January 3, 2014 or thereafter because Alcoa did not take delivery and thus title did not pass from Ormet to Alcoa. They urge this would likewise mean

the anodes were not Excluded Assets under the Asset Purchase Agreement. They assert title to the undelivered anodes stayed with Ormet until Ormet sold its remaining assets to Appellants at which point title transferred to Appellants.

{¶21} Assuming Ormet waived the 120-day delivery requirement, Appellants say this could only last as long as Ormet had title to the anodes. Appellants claim waiver of the delivery provision is not equivalent to waiver of the title transfer provision. Appellants urge amendment of this provision would have to be in writing due to the terms attached to the Anode Purchase and Sale Agreement (Attachment A, ¶ 1, 13) and a provision in the bankruptcy order. As to the court's reference to equity, Appellants point out a court cannot rewrite contractual or statutory provisions to reach what the court believes is a fair result.[4]

{¶22} Alcoa responds by noting the U.C.C. provisions are "gap-fillers" to be used when the parties do not provide their own terms, citing 6 Del.C. 1-302(a), which provides that except as otherwise provided: "the effect of provisions of the Uniform Commercial Code may be varied by agreement." As the Anode Purchase and Sale Agreement provided the execution date was the "sale date," Alcoa urges that we need not resort to the U.C.C. provision stating a sale "consists in the passing of title from the seller to the buyer for a price." Appellants reply by citing comment 1 under 6 Del.C. 1-302(a), which says "the effect" of U.C.C. provisions may be varied, but definitions cannot be changed.

{¶23} Alternatively, Alcoa notes the court found the delivery provision was waived by Ormet and was no longer part of the agreement. Alcoa suggests there is no distinction between waiver of the delivery deadline and waiver of the title transfer provision. Alcoa also points to the language in the Asset Purchase Agreement as to Excluded Assets (which expressly includes inventory sold pursuant to order of the bankruptcy court prior to the date of the Asset Purchase Agreement) and Appellants' obligation to store such assets for six months.

---

[4] They believe the court's mention of forfeiture and abandonment underscores the error, noting one cannot forfeit or abandon property one never owned. (Factually, a lack of forfeiture or abandonment are not contested; rather, Appellants say the court should not have reached these principles because one must have an recognizable interest in order to abandon it.)

**{¶24}** Appellants reply the language of the bankruptcy court order approving Alcoa's purchase of the anodes anticipated a sale in the future. For instance, the order states the transfer of the assets to the purchaser "*will be* a legal, valid and effective transfer of the Purchased Assets and *will vest* the Purchaser with all rights to and interests of the Debtor in and to such Purchased Assets free and clear of all liens, claims, encumbrances and interest *as set forth in the Purchase Agreement.*" (Emphasis added by Appellants). *In re Ormet Corp.,* Bankr.Del. No. 13-10334, p.10 (Jan. 6, 2014). Elsewhere, the order provides: "The transactions contemplated by the Purchase Agreements will, upon consummation thereof (the 'Closing'), (i) be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser * * * and (ii) vest the Purchaser with good title to the Purchased Assets free and clear of all Liens * * * except as expressly permitted by the Purchase Agreement." *Id.* at p.3.

**{¶25}** The order also said the purchaser and debtor had no obligation to close the sale except as contemplated and provided in the Anode Purchase and Sale Agreement. *Id.* at p.7. Finally, the order allowed the debtors to perform each covenant and undertaking as provided in the agreement "prior to or after the closing of the sale of the Purchased Assets * * *." *Id.*[5]

### U.C.C. LAW: SALE OF GOODS

**{¶26}** Under the U.C.C., a "contract for sale" includes both a present sale of goods and contract to sell goods at a future time. 6 Del.C. 2-106(1). *See also* R.C. 1302.01(A)(11). A "sale" "consists in the passing of title from the seller to the buyer for a price." *Id.* Still, the provisions of the U.C.C. as to the rights, obligations, and remedies of the parties apply "irrespective of title to the goods" unless the provision at issue refers to title. 6 Del.C. 2-401(1). *See also* O.R.C. 1302.42.

**{¶27}** The U.C.C. answers the question of when title passes only if the agreement does not explicitly so state. 6 Del.C. 2-401(1)-(4). *See also* R.C.

---

[5] The Anode Purchase and Sale Agreement for the anodes at the Hannibal Plant did not expressly mention "closing," whereas the agreement related to the anodes at the Baltimore warehouse did discuss closing by providing: closing conditions (bankruptcy court order approving the sale; buyer reaching agreement with warehouse, and buyer's confirmation of quantity); the purchase price was payable at closing; and title to (and risk of loss of or damage to) the product would pass at closing.

1302.42(A)-(D).[6]   Otherwise, title passes in any manner and on any conditions expressly agreed between the parties.  6 Del.C. 2-401(1).  *See also* R.C. 1302.42(A).

{¶28} Tender of delivery requires the seller put and hold conforming goods at the buyer's disposition and give any notification to enable the buyer to take delivery. 6 Del.C. 2-503(1).  *See also* R.C. 1302.47(A).  "The manner, time and place for tender are determined by the agreement and this Article, and in particular (a) tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable buyer to take possession * * *."  *Id.*

{¶29} "Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this subtitle." 6 Del.C. 2-401(1).  The identification can be made in any manner explicitly agreed; in the absence of an agreement, it occurs when the contract is made if it is for the sale of goods already existing and identified.  6 Del.C. 2-501(1)(a).  "The buyer obtains a special property and an insurable interest in goods by identification of existing goods" even if the buyer can reject them.  6 Del.C. 2-501(1).  *See also* R.C. 1302.45(A).

{¶30} As Appellants also refer to Alcoa's rights or lack thereof prior to Ormet's sale of remaining assets, we recite some additional law.  In general, the seller's unsecured creditor's right, with respect to goods which have been identified to a contract for sale, are subject to the buyer's right to recover the goods under 2-502 and 2-716.  6 Del.C. 2-402(1).  *See also* R.C. 1302.43(A).  Where a third party deals with goods which have been identified to a contract for sale, the right of action against the third party is in either party to the contract for sale who has title to or a security interest *or a special property* or an insurable interest *in the goods*.  6 Del.C. 2-722(a).  *See also* R.C. 1302.96.(A).

{¶31} Pursuant to 2-502, a buyer who paid all of the price of goods in which he has a special property under 2-501 may recover the goods from the seller if the

---

[6] For instance, title passes when the seller completes performance with reference to physical delivery (unless otherwise explicitly agreed).  6 Del.C. 2-401(2).  If the delivery is to be made without moving the goods, the good are identified at the time of contracting, and no title documents are to be delivered, then title passes at contracting (unless otherwise explicitly provided). 6 Del.C. 2-401(3)(b).

seller becomes insolvent within ten days after receipt of the first price installment. 6 Del.C. 2-502(1)(b) (and the buyer who paid part of price must tender unpaid part), (2) (this right to recover "vests upon acquisition of a special property," even if the seller did not fail to deliver); Comment 1 ("The buyer's right to recover the goods under this section is an exception to the usual rule, under which the disappointed buyer must resort to an action to recover damages."). *See also* R.C. 1302.46(A)-(B). Here, the contract for sale was entered with approval of the bankruptcy court, i.e., the seller was already in bankruptcy when the contract for sale was entered and the price was paid.

**{¶32}** In addition to this right of recovery, the buyer has the right of replevin for goods identified to the contract if after reasonable effort he is unable to effect cover or the circumstances reasonably indicate such effort will be unavailing. 6 Del.C. 2-716(2). *See also* 6 Del.C. 2-716(1) (specific performance may be decreed where the goods are unique or in other proper circumstances), Comment 4 ("This section is intended to give the buyer rights to the goods comparable to the seller's rights to the price."); R.C. 1302.90 (A)-(B). In general, an action for replevin can be sought by a party with a general or special property (or interest) in goods with the right to immediate possession. *See, e.g., Holstein v. Holstein,* 7th Dist. No. 559 (May 4, 1982); *Rudnick v. Schoenberg*, 32 Del. 339, 122 A. 902, 903 (1923).

ANALYSIS

**{¶33}** There is no dispute the anodes were identified: they existed at Ormet's facility at the time of contracting; they represented all of Ormet's anodes at the Hannibal facility; they had a projected weight of 17,086 metric tons (and 7,316 metric tons of the anodes had been picked up by Alcoa); and the anodes were subject to a piece count prior to full payment by Alcoa. Although distinct from title, this identification created a "special property" which is a type of ownership interest.

**{¶34}** Factually, the trial court found Ormet waived the 120-day delivery term, and this factual finding is not contested on appeal. Appellants emphasize the waiver of the delivery deadline was not an elimination of the title passing provision, i.e., title did not transfer on the day after the deadline (or retroactively to the date of execution)

merely because the deadline was extended; rather, title would transfer when delivery finally occurred. Upon waiver of the delivery deadline, the tender of delivery by Ormet was available for the period reasonably necessary to enable Alcoa to take possession. *See* 6 Del.C. 2-503(1)(a).

**{¶35}** Ormet then entered an Asset Purchase Agreement to sell its "remaining" assets, which specifically excluded certain assets from the sale. All inventory, even if it remained at the Hannibal facility, was excluded if it "has been sold pursuant to an order of the Bankruptcy Court prior to the date of this Agreement." Schedule 1.01(r)(6). *See also* Art. V, 5.04 (requiring Appellants to store and hold excluded assets for six months). A prior order of the bankruptcy court approved the Anode Purchase and Sale Agreement. This agreement defined the sale date as the date of execution.

**{¶36}** Appellants knew of the Anode Purchase and Sale Agreement before they placed a bid on Ormet's remaining assets. Appellants raise no bona fide purchaser argument. Instead, they direct the focus to Alcoa's lack of title and the trial court's reference to Alcoa's right being based upon a prior passage of title. Even if the court incorrectly suggested title passed prior to delivery of the anodes, the result can be affirmed when some of the various reasons provided by the trial court may not be correct. *See, e.g., Agricultural Ins. Co. v. Constantine* (1944), 144 Ohio St. 275, 284, 58 N.E.2d 658 (1944) ("it is the definitely established law of this state that where the judgment is correct, a reviewing court is not authorized to reverse such judgment merely because erroneous reasons were assigned as a basis thereof").

**{¶37}** Appellants' main focus is on the contract's statement of when title passes and the U.C.C.'s statement that a sale "consists in the passing of title from the seller to the buyer for a price." *See* 6 Del.C. 2-106(1). Yet, title does not govern rights under the U.C.C. unless the provision at issue refers to title. 6 Del.C. 2-401. The contract's explicit provisions govern when title passes if "matters concerning title become material." *Id.* Moreover, the anodes were still the subject of a "contract for sale" which "includes both the present sale of goods and a contract to sell goods at a future time." *See id.*

**{¶38}** This contract of sale, once approved by the bankruptcy court order and once the goods were identified, gave Alcoa a "special property" or special interest in the anodes irrespective of whether title passed. Regardless of whether title passed, when a third party deals with goods identified to a contract for sale so as to cause actionable injury to a contracting party, any party to the contract who has title to "or a special property" in the goods has a right of action. 6 Del.C. 2-722(a).

**{¶39}** We conclude the anodes qualify as being "sold pursuant to an order of the Bankruptcy Court prior to the date of [the Asset Purchase] Agreement." As the anodes were previously sold pursuant to the court order, they were excluded assets under the Asset Purchase Agreement (which was also approved by the bankruptcy court). Alcoa had an ownership interest in the goods; even assuming that interest was not legal title, the interest was enforceable. The trial court's alternative resort to equity is moot. Appellants' sole assignment of error is overruled, and the trial court's judgment is affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.